Filed 6/15/22

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALEKSANDR REZNITSKIY et al., <br><br> Plaintiffs and Appellants, <br> v. <br> COUNTY OF MARIN et al., <br><br> Defendants and Respondents. | A161813 <br><br> (Marin County <br> Super. Ct. No. CIV1903573) |

The Housing Accountability Act (HAA) (Gov. Code, § 65589.5)[1] was enacted 40 years ago as part of broad legislative efforts to address California's housing crisis. The statute aims "to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters." (§ 65589.5, subd. (a)(2)(K).) As one way to encourage housing construction, the HAA bars local agencies from denying any proposed "housing development project" unless the denial is based on objective criteria or the agency finds that the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.C. and II.D.

[1] All further statutory references are to the Government Code unless otherwise noted.

project would adversely impact public health or safety. (§ 65589.5, subd. (j)(1).)

Aleksandr Reznitskiy and Cecily Rogers (plaintiffs) appeal from the denial of their petition for a writ of administrative mandamus involving their application to build a nearly 4,000-square-foot single-family home on a hillside lot in San Anselmo (the project). After concluding that the project was not subject to the HAA, respondents Marin County and the County of Marin Board of Supervisors (collectively, the County) denied plaintiffs' application on several bases, including that the home was outsized compared to the surrounding neighborhood. Plaintiffs claim that their planned home qualifies as a "housing development project" under the HAA and that the County improperly rejected it based on subjective criteria. They also claim that the County is equitably estopped from arguing that the HAA does not apply and that, in any case, insufficient evidence supports the County's decision.

We conclude that the County lawfully rejected plaintiffs' application. In the published portion of this opinion, we address a longstanding question the Legislature has deliberately left unresolved and hold that the HAA does not apply to a project to build an individual single-family home. In the remaining portion of the opinion, we reject plaintiffs' equitable-estoppel and insufficient-evidence claims. Accordingly, we affirm.

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

In 2016, plaintiffs applied to build a single-family home and accessory dwelling unit (ADU) totaling 5,145 square feet on a 1.76-acre lot they own in San Anselmo. The lot is "heavily wooded" and slopes "steeply" upward from a creek. It has no vehicular access, and the project included a driveway that

2

bridged the creek, a "concrete parking deck with an emergency access/ turnaround area," and a temporary access road to enable construction of the house and driveway. Plaintiffs also sought a tree-removal permit because the project proposed removing "[a]pproximately 19 trees . . . classified as either 'protected' or 'heritage' per the Marin County Development Code."

After receiving preliminary comments from the planning division of the County's Community Development Agency (Agency), plaintiffs revised the project to remove the ADU and reduce the house's floor plan to 3,872 square feet. In February 2019, the planning division issued an administrative decision approving the project and granting the tree-removal permit. The decision found that as redesigned, the project was compatible with the surrounding neighborhood and consistent with the Marin Countywide Plan and the Marin County Code's mandatory findings for design review.

The following month, neighbors appealed the planning division's decision to the Marin County Planning Commission (Commission). They argued that the size of the project rendered it incompatible with the neighborhood, and they provided a survey showing that "[t]he average size of the nearest 25 residences [was] 1,544 square feet," significantly smaller than plaintiffs' proposed house. The neighbors also argued that the creek would be negatively affected, questioned the need for a large bridge, and urged that fewer trees be removed.

Before the Commission hearing on the appeal in May 2019, the planning division prepared a report recommending that its administrative decision be upheld. At the hearing, an array of evidence was considered, including the staff report, project plans, testimony by Reznitskiy, and written and oral opposition from the public. After several commissioners expressed

3

concern about the project's scale and environmental impacts, the Commission unanimously voted to grant the neighbors' appeal and deny the project.

Plaintiffs appealed the Commission's decision to the County of Marin Board of Supervisors (Board). Among other arguments, plaintiffs claimed that "further downsizing" of the project was unnecessary and that the project's denial violated the HAA. The Agency submitted a letter to the Board recommending that the project's denial be upheld, now agreeing that the project was outsized for the neighborhood and would unduly impact the creek and environment. The letter contended that the HAA applied only to "large-scale housing projects such as mixed-use, multiple residential unit projects, transitional and supportive housing," and the project "[did] not qualify as [such] a higher density residential project."

In August 2019, the Board heard plaintiffs' administrative appeal. Additional evidence was presented, including the testimony of two of plaintiffs' civil engineers and further testimony by neighbors opposed to the project. One Board supervisor observed that although plaintiffs had "a right to develop" the property, the project was "not ready for prime time yet" and "need[ed] to be scaled down and the design refined." The Board then unanimously voted to uphold the Commission's decision denying the project. The Board also issued a resolution summarizing its reasons for denying plaintiffs' appeal. As relevant here, the resolution affirmed that the proposed residence was oversized and concluded that the HAA did not apply to the project.

The following month, plaintiffs filed a petition for a writ of administrative mandamus in the trial court to challenge the County's denial of the project. They claimed that the project constituted a "housing development project" under the HAA and "complie[d] with all applicable

4

objective general plan and zoning standards and criteria, including design review standards, in effect at the time of the Project application" under section 65589.5, subdivision (j)(1). Alternatively, plaintiffs argued that even if the HAA did not apply, the County's findings were not supported by substantial evidence. In December 2020, the trial court rejected these arguments and denied the petition.[2]

## II.
## DISCUSSION

### A. General Legal Standards

#### 1. Standards of review in administrative writ proceedings

In their petition for a writ of administrative mandamus, plaintiffs claimed the County prejudicially abused its discretion in denying their application to build the project. Under Code of Civil Procedure section 1094.5, subdivision (b), "[a]buse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

In an administrative writ proceeding that, like this one, does not involve a fundamental vested right, the trial court reviews the agency's factual findings for substantial evidence and its legal conclusions de novo. (Code Civ. Proc., § 1094.5, subd. (c); *Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1260–1261 (*Schafer*).) "An appellate court in a case not involving a fundamental vested right reviews the agency's decision,

---

[2] The trial court did not enter a separate judgment, but an order denying a petition for a writ of administrative mandamus is appealable if it "effectively disposes of the action because no issues remain to be determined." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056.)

5

rather than the trial court's decision, applying the same standard of review applicable in the trial court." (*Schafer*, at p. 1261.)

### 2. The HAA

The HAA is part of the Housing Element Law (§ 65580 et seq.), "which 'set[s] forth in considerable detail a municipality's obligations to analyze and quantify the . . . locality's share of the regional housing need . . . and to adopt and to submit to California's Department of Housing and Community Development [(Department)] a multiyear schedule of actions the local government is undertaking to meet these needs.' " (*California Renters Legal Advocacy & Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, 834 (*CaRLA*).) In 1982, the Legislature enacted the HAA, "colloquially known as the 'Anti-NIMBY' (Not-In-My-Back-Yard) law," to address the dearth of housing in the state. (*Id.* at pp. 834–835.) Under section 65589.5, subdivision (j) (section 65589.5(j))—the provision that plaintiffs contend applies to the project—"[w]hen a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time the application was deemed complete," the local agency cannot "disapprove the project or . . . impose a condition that the project be developed at a lower density" unless it finds that (1) the project "would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density" and (2) "[t]here is no feasible method to satisfactorily mitigate or avoid [that] adverse impact, other than disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density." (§ 65589.5(j)(1).) A project must be "deemed consistent, compliant, and in conformity with" applicable standards

6

and criteria "if there is substantial evidence that would allow a reasonable person to [so] conclude."  (§ 65589.5, subd. (f)(4).)

Since enacting the HAA, the Legislature "has amended the statute repeatedly in an increasing effort to compel local governments to approve more housing."  (*CaRLA, supra*, 68 Cal.App.5th at p. 835.)  Of relevance here, in 1999 the Legislature amended section 65589.5(j) "to narrow the kinds of policies that could be invoked to defeat an application, adding the italicized words:  'When a proposed housing development project complies with applicable, *objective* general plan and zoning *standards and criteria*,' the project cannot be denied or reduced in density without the specified health and safety findings."  (*CaRLA*, at p. 835.)  Thus, under section 65589.5(j) an agency cannot "use what might be called a 'subjective' development 'policy' (for example, 'suitability')" to avoid making the findings otherwise required to disapprove a housing development project.  (*Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1076–1077 (*Honchariw I*).)

In 2017, the Legislature made relevant "detailed findings" when it again amended the HAA.  (*CaRLA, supra*, 68 Cal.App.5th at p. 836.)  It found that "California has a housing supply and affordability crisis of historic proportions" in which "the absence of meaningful and effective policy reforms to significantly enhance the approval and supply of housing affordable to Californians of all income levels is a key factor."  (§ 65589.5, subd. (a)(2)(A)–(B); Stats. 2017, ch. 378, § 1.5.)  It also found that this crisis had worsened "despite the fact that, for decades, the Legislature has enacted numerous statutes intended to significantly increase the approval, development, and affordability of housing for all income levels, including this section," and that the legislative intent "to significantly increase the approval and construction of new housing for all economic segments of California's communities . . . has

7

not been fulfilled." (§ 65589.5, subd. (a)(2)(J)–(K); Stats. 2017, ch. 378, § 1.5.) And finally, it added the following "interpretative gloss" to the statute: " 'It is the policy of the state that [the HAA] should be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing.' (§ 65589.5, subd. (a)(2)(L); Stats. 2017, ch. 378, § 1.5.)" (*CaRLA*, at p. 836.)

### B. A Project To Build One Single-family Home Is Not a "Housing Development Project" Under the HAA.

The main issue we must resolve is whether plaintiffs' proposal to build a single-family home qualified as a "housing development project" and could not be denied unless the County complied with section 65589.5(j).[3] We independently review issues of statutory interpretation. (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1041.) "Our primary task 'in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent.' " (*Ibid.*) "We give the words their usual and ordinary meaning [citation], while construing them in light of the statute as a whole and the statute's purpose [citation]. . . . 'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Pineda v. Willams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 529–530.)

If, however, "the statute's language is ambiguous or susceptible of more than one reasonable interpretation," we " ' "may examine the context in which the language appears, adopting the construction that best harmonizes

---

[3] Californians for Homeownership, The California Association of Realtors®, Building Industry–Bay Area, and YIMBY Law were granted leave to file a brief as amici curiae in support of plaintiffs on this question.

the statute internally and with related statutes." ' " (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1103; *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 192–193; see *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) We may also " ' "look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, [and] contemporaneous administrative construction." ' " (*People v. Jefferson* (1999) 21 Cal.4th 86, 94.) Our focus is "on the Legislature's intent *when it enacted the statute*," not on "hypothetical postenactment legislative intent." (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1047–1048.)

Subdivision (h) of the HAA provides that "for the purposes of this section . . . , [¶] . . . [¶] (2) 'Housing development project' means a use consisting of any of the following: [¶] (A) Residential units only. [¶] (B) Mixed-use developments consisting of residential and nonresidential uses with at least two-thirds of the square footage designated for residential use. [¶] (C) Transitional housing or supportive housing." There is little caselaw interpreting this statutory definition. In *Honchariw I*, the Fifth District Court of Appeal addressed whether a project to build "a single-family dwelling to ultimately be constructed on each of . . . eight proposed lots" was a "proposed housing development project" under section 65589.5(j). (*Honchariw I, supra*, 200 Cal.App.4th at pp. 1072, 1074.) *Honchariw I*'s primary holding was that although other subdivisions of section 65589.5 address affordable housing, subdivision (j) "is not limited to affordable housing development projects." (*Honchariw I*, at pp. 1075, 1077; accord *North Pacifica, LLC v. City of Pacifica* (N.D.Cal. 2002) 234 F.Supp.2d 1053, 1057.) The Court of Appeal also stated in passing that since the project contemplated eight single-family homes, its "anticipated use [was] . . .

9

'[r]esidential units only' (§ 65589.5, subd. (h)(2)(A)), and the proposed project [was] therefore a 'proposed housing development project' within the meaning of section 65589.5(j)." (*Honchariw I*, at p. 1074.) But no decision has addressed whether a project to build a single residential unit qualifies as a "housing development project."

In considering the question, we begin by observing that the statutory definition is imprecise because it does not describe what a "housing development project" *is*. The provision does not explicitly define the words "housing," "development," or "project," either individually or collectively. (See § 65589.5, subd. (h)(2).) Rather, the provision states that the term "means a use" consisting of one of three types, thus focusing only on the purpose a project must have to be subject to subdivision (j)'s stricter requirements for disapproval. (§ 65589.5, subd. (h)(2); *Honchariw I*, *supra*, 200 Cal.App.4th at p. 1074.)

The reason for this focus is explained by the legislative history of Senate Bill No. 619 (2003–2004 Reg. Sess.) (Senate Bill No. 619), which added the definition of "housing development project" to the HAA.[4] This part of the bill was described as "[e]xtend[ing] protections of the anti-NIMBY act to mixed-use housing developments." (Sen. Rules Com., Off. of Sen. Floor

---

[4] As originally enacted, the statutory definition provided that "housing development project" meant "a use consisting of either of the following: [¶] (A) Residential units only. [¶] (B) Mixed-use developments consisting of residential and nonresidential uses in which nonresidential uses are limited to neighborhood commercial uses and to the first floor of buildings that are two or more stories. As used in this paragraph, 'neighborhood commercial' means small-scale general or specialty stores that furnish goods and services primarily to residents of the neighborhood." (Stats. 2003, ch. 793, § 3.) The definition was subsequently amended to add "transitional housing or supportive housing" as a qualifying use (Stats. 2007, ch. 633, § 4) and to change the description of a mixed-use development (Stats. 2017, ch. 368, § 1).

Analyses, 3d reading analysis of Sen. Bill No. 619, as amended May 27, 2003, p. 3.)[5]  While at the time the HAA prevented an agency "from disapproving an affordable housing development" without making certain findings, the bill "provide[d] that, in addition to residential-only developments, the protections of the [HAA would] apply to mixed-use residential developments in which neighborhood-serving commercial uses occupy the first floor of a building that is at least two stories."  (Sen. Housing & Community Development Com., Rep. on Sen. Bill No. 619, Apr. 4, 2003, p. 3.)  Thus, it is apparent that the purpose of adding the definition was to clarify that mixed-use developments are subject to the HAA, not to define comprehensively the term "housing development project."

This matters because unless we know the full meaning of "housing development project," it is difficult to evaluate the parties' central dispute: whether the plural term "residential units" includes the singular "residential unit."  The County claims that we "need look no further than the plain text" of section 65589.5, subdivision (h)(2)(A), "which uses the words 'residential units,' in the plural form," to conclude that an individual single-family house is excluded.  This argument has some force, as the ordinary meaning of "residential units" is more than one residential unit.  (See, e.g., *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132 [plain meaning of "criminal conduct by members" of a gang requires at least two members participate].)

But as plaintiffs observe, if "residential units" is strictly construed to mean the plural only, it is not apparent why "mixed-use developments" under

_____

[5] The trial court took judicial notice of two other committee analyses of Senate Bill No.  619, which plaintiffs rely on and we discuss further below. On our own motion, we take judicial notice of the additional legislative materials cited in this paragraph and below.  (See Evid. Code, §§ 452, subd. (c), 459.)

11

subdivision (h)(2)(B) of section 65589.5 should not also be so construed.  Yet if "[m]ixed-use developments" included the plural only, then we would be left with the absurd result that a single mixed-use development project would not qualify as a housing development project.[6]  Although the County dismisses plaintiffs' argument as overly technical, we conclude that the use of the plural, standing alone, does not establish that only the plural was intended. (See, e.g., *Bay Guardian Co. v. New Times Media LLC* (2010) 187 Cal.App.4th 438, 460–461 [rejecting "literal reading" of plural that would result in "illogical and meaningless consequences"].)

The Department has interpreted the HAA not to "apply to applications for individual single-family residences," reasoning that "[b]ecause the term 'units' is plural, a development has to consist of more than one unit to qualify under the [statute]."  (Cal. Dept. of Housing and Community Development, HAA Technical Assistance Advisory memorandum, Sept. 15, 2020, p. 19, available at <https://www.hcd.ca.gov/community-development/housing-element/housing-element-memos/docs/hcd-memo-on-haa-final-sept2020.pdf> (last visited June 14, 2022).)  Plaintiffs argue that we should not defer to this interpretation, and the County does not argue otherwise.  Since we do not find the HAA's use of the plural "units" to be definitive, we give little weight

---

[6] While we agree with plaintiffs on this point, we do not agree that excluding an individual single-family home from the HAA would also "create an absurd inconsistency" in light of the provision for mixed-use developments.  Plaintiffs posit that a three-story building composed of "ground-floor retail and a single residential unit on the second and third floors" would qualify as a "housing development project" even though a stand-alone single residential unit would not.  But this might encourage inclusion of a residential unit that would not otherwise have been built in a more commercial area.  In any case, we suspect that projects to construct a single residential unit at least double the size of an accompanying nonresidential use are not common.

12

to the Department's interpretation in our de novo review of the statute's meaning. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8.)

Although we agree with plaintiffs that the use of the plural "units" does not establish that only the plural was intended, we are unconvinced that section 13, which provides that "[t]he singular number includes the plural, and the plural the singular," necessarily controls. "Section 13 is subject to the usual qualification that the definitions given in such preliminary sections govern the construction of the Government Code '*[unless] the provision or the context otherwise requires . . . .*' (§ 5.) Preliminary definitions are superseded when they obviously conflict with the Legislature's subsequent use of the term in a different statute in a different context." (*Price v. Tennant Community Services Dist.* (1987) 194 Cal.App.3d 491, 499, italics added; see *People v. Rodriguez, supra,* 55 Cal.4th at pp. 1132–1133 [considering similar provision under the Penal Code].) In short, we cannot resolve whether a single house qualifies as a "housing development project" based merely on the HAA's reference to "residential units."

We therefore turn to the broader meaning of "housing development project." The HAA falls under chapter 3 of the Planning and Zoning Law (§ 65000 et seq.). Although the words "housing," "development," and "project" are not individually defined in this chapter, "the terms development, project[,] and development project are defined in another chapter of the Planning and Zoning Law," chapter 4.5, "relating to the review and approval of development projects." (*Chandis Securities Co. v. City of Dana Point* (1996) 52 Cal.App.4th 475, 485–486 (*Chandis*).)

In *Chandis,* the Fourth District Court of Appeal addressed whether a city's proposed "adoption of a specific plan and a general plan amendment

13

relating to [the] plaintiffs' property" that would have "allow[ed] development of the land" qualified as a "housing development project" under the HAA when that term was not yet statutorily defined.  (*Chandis*, *supra*, 52 Cal.App.4th at pp. 479, 485–486.)  *Chandis* determined it was appropriate to consult the definitions in chapter 4.5 because "identical words . . . in different statutes relating to the same subject matter are construed as having the same meaning."  (*Id.* at pp. 485–486.)  Then as now, those definitions consist of the following:  " ' "Development["] means . . . the placement or erection of any solid material or structure; . . . grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land . . . .'  ' "Project" means any activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies.'  (§ 65931.) ' "Development project" means any project undertaken for the purpose of development . . . .'  (§ 65928.)  It includes 'a project involving the issuance of a permit for construction or reconstruction . . . .'  (*Ibid.*)"  (*Chandis*, at pp. 485– 486.)  *Chandis* concluded that these definitions "apply when a local planning agency is considering a specific construction proposal" and "would not include the disapproval or conditional approval of a specific plan."  (*Id.* at p. 486.)

Still, these statutes do not resolve the meaning of the unhyphenated phrase "housing development project."  As their broad definitions suggest, the phrase could use development as a verbal adjective and mean a project to develop housing (a housing "development project").  On the other hand, the phrase could use development as a concrete noun and mean a project to build a housing development (a "housing-development" project), a concept these statutes do not define.  Under the first interpretation, a project to build a single home would seemingly qualify as a housing development project,

14

because it is a "project undertaken for the purpose of development" (§ 65928) and the development activity consists of constructing housing. Under the second interpretation, the same project would seemingly *not* qualify as a housing development project, since an individual single-family home is not a "housing development," a term that generally refers to a *group* of housing units.[7] (See, e.g., Oxford English Dictionary Online <https://www.oed.com/view/Entry/88956?#eid1365281> (as of June 14, 2022) ["the action or process of planning and building a group of houses and associated services on a site; (*concrete*) the result of this, a housing estate"]; Merriam-Webster Dict. Online <https://www.merriam-webster.com/dictionary/housing%20development> (as of June 14, 2022) ["a group of individual dwellings or apartment houses typically of similar design that are usually built and sold or leased by one management"].) We accept that some of the definitional statutes in the Planning and Zoning Law arguably support the first interpretation. But, as we now explain, the HAA's statutory context as a whole, legislative history, and purpose weigh more in favor of the second interpretation.

Since the definition of "housing development project" is ambiguous, we turn to the more specific statutory context in which it appears. (See *Murphy v. Kenneth Cole Productions, Inc.*, *supra*, 40 Cal.4th at p. 1103.) Other parts of the HAA use "development" as a concrete noun when referring to housing development projects, suggesting that the phrase means a project to construct a housing development, not a project to develop housing. Section 65589.5(j)(2)(A) provides that "[i]f the local agency considers a

_____

[7] Since we need decide only whether a project consisting of one residential unit qualifies as a "housing development project," we express no opinion whether that term contemplates a minimum number of units that is greater than two.

15

proposed housing development project to be inconsistent, not in compliance, or not in conformity with an applicable . . . provision . . . , it shall provide the applicant with . . . an explanation of the reason or reasons it considers *the housing development* to be inconsistent, not in compliance, or not in conformity." (Italics added.) Subdivision (k), which addresses litigation to enforce the HAA, provides that a "court may issue an order or judgment directing the local agency to approve the housing development project or emergency shelter if the court finds that the local agency acted in bad faith when it disapproved or conditionally approved *the housing development* or emergency shelter in violation of this section."[8] (§ 65589.5, subd. (k)(1)(A)(ii), italics added.) Other examples are found in subdivision (*l*), addressing increased fines for failing to comply with a court's order, and subdivision (o), addressing the ordinances, policies, and standards that apply to a housing development project depending on when a preliminary application is submitted.

Section 65582.1, which is also part of the Housing Element Law, further supports the interpretation that "housing development project" means a project to construct a housing development. Section 65582.1 sets

---

[8] In *Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019 (*Honchariw II*), the Fifth District held that a developer was not entitled to attorney's fees under former section 65589.5, subdivision (k), which provided that such fees be awarded to a prevailing party "who proposed the housing development." (Former § 65589.5, subd. (k); *Honchariw II*, at p. 1023.) After observing that *Honchariw I*'s interpretation of "housing development project" was not binding because of the "slight difference in language," *Honchariw II* concluded that in context "housing development" included only affordable housing. (*Honchariw II*, at pp. 1023–1024.) Subdivision (k) has since been amended to apply to litigation involving all housing development projects, not just those to build affordable housing, and the language *Honchariw II* addressed has been removed. (See § 65589.5, subd. (k)(1)(A)(i)(II).)

16

forth the finding that the Legislature "has provided reforms and incentives to facilitate and expedite the construction of affordable housing" and lists the provisions containing those reforms and incentives. One of the provisions listed is the HAA, which is described as "Restrictions on disapproval of *housing developments* (Section 65589.5)." (§ 65582.1, subd. (c), italics added.) Section 65582.1 was added in 2006 (Stats. 2006, ch. 888, § 4), a few years after the definition of "housing development project" was added to the HAA, and has always described the HAA as pertaining to "housing developments."[9]

The legislative history of Senate Bill No. 2011 (1981–1982 Reg. Sess.) (Senate Bill No. 2011), which enacted the HAA, also supports the conclusion that "housing development project" refers to a project to build a housing development.[10] Committee reports uniformly described the bill as pertaining to "housing developments." For example, under the heading "Housing developments," a staff analysis stated the bill would "shift[] the burden of proof onto the county or city if it approves a housing development at less than the maximum permitted density, or if it disapproves a housing development which conforms to local planning, zoning, and development policies." (Sen. Local Government Com., Analysis of Sen. Bill No. 2011, May 3, 1982, p. 1.) Likewise, a legislative analyst report stated the bill would "specif[y] the bases

[9] Although not indicative of legislative intent, decisions interpreting the HAA have also described it as involving housing developments. (E.g., *CaRLA, supra*, 68 Cal.App.5th at p. 835 [HAA governs disapproval of "a proposed housing development"]; *Kalnel Gardens, LLC v. City of Los Angeles* (2016) 3 Cal.App.5th 927, 938 [HAA "was designed to limit the ability of local governments to reject or render infeasible housing developments based on their density"]; *Chandis, supra*, 52 Cal.App.4th at p. 485 [before *Honchariw I*, describing the HAA as "concern[ing] affordable housing developments"].)

[10] On our own motion, we take judicial notice of the legislative materials pertaining to Senate Bill No. 2011 that are cited below. (See Evid. Code, §§ 452, subd. (c), 459.)

17

on which a local agency may decide to disapprove, or conditionally approve, a proposed housing development" and require "disapprovals . . . [to] be based on [a] written finding[] by the local agency . . . that the development would have an adverse impact on public health or safety." (Legislative Analyst, Analysis of Sen. Bill No. 2011, as amended Aug. 2, 1982, pp. 1–2.) Other legislative materials contain similar language. (E.g., Assembly 3d reading analysis, Sen. Bill No. 2011, as amended Aug. 17, 1982, p. 1 [bill "[r]equires a local agency to base its approval or disapproval of a proposed housing development on written findings, as specified"]; Sen. Republican Caucus, analysis of Sen. Bill No. 2011, Aug. 23, 1982, p. 2 ["If a proposed housing development that was originally disapproved must now be approved as a result of this measure, the locality would experience increased costs for public services"].)

The legislative history of Senate Bill No. 2011 also highlights that the HAA encourages more housing by limiting a local agency's ability to approve lower-density projects—a scenario that would never apply to a single-unit project. The HAA, both as originally enacted and today, restricts agencies' ability to approve projects "upon the condition that the project be developed at a lower density." (Stats. 1982, ch. 1438, § 2; § 65589.5(j)(1).) As one committee report explained, "The cost of housing reflects several factors including, of course, the cost of land and the installation of infrastructure to service the unit. The greater the number of units which may be constructed on a given parcel, the lower the unit's proportionate share of the land and infrastructure costs will be. The provisions of Section 65589.5 would discourage reducing the density of a proposed development which meets the zoning and planning policies in effect." (Assem. Com. on Housing & Community Development, Analysis of Sen. Bill No. 2011, as amended May 19, 1982, p. 1.) This goal further suggests that the term "housing

18

development project" was meant to cover projects to construct housing developments, not projects to build one unit of housing.

Subsequent legislative activity regarding the HAA is consistent with this conclusion, contrary to plaintiffs' claim otherwise. Plaintiffs direct us to a Senate committee report on Senate Bill No. 619 that described the bill as defining "housing development project" to mean "residential housing or mixed-use developments." (Sen. Com. on Natural Resources and Wildlife, Analysis of Sen. Bill No. 619, Apr. 21, 2003, p. 3.) Plaintiffs also point out that another Senate committee report described the bill as "provid[ing] that, in addition to residential-only developments, the protections of the anti-NIMBY act apply to mixed-use residential developments in which neighborhood-servicing commercial uses occupy the first floor of a building that is at least two stories." (Sen. Rules Com., Off. Of Sen. Floor Analyses, Unfinished Business analysis of Sen. Bill No. 619, as amended August 25, 2003, p. 3.) According to plaintiffs, these reports show that "[t]he Legislature did not suggest that the 'residential housing' meant by a housing development project under the HAA is subject to a minimum number of units. Rather, it referred generally to residential developments, alongside mixed-use developments."

To the extent these portions of the Senate committee reports are revealing, they do not advance plaintiffs' position. Rather, the reports repeatedly use development as a concrete noun, which supports the interpretation of "residential units" to mean more than one unit. Instances of this usage also appear in other portions of the legislative history of Senate Bill No. 619. (See, e.g., Sen. Com. on Housing & Community Development, Analysis of Sen. Bill No. 619, as amended Apr. 1, 2003, p. 3 [the bill "provides that, in addition to residential-only developments, the protections of the

19

[HAA] apply to mixed-use residential developments"].)  And although the phrase "residential housing or mixed-use developments" could be interpreted to refer to "residential housing," a term whose ordinary meaning would include an individual single-family home, the phrase could also be read so that "residential housing" modifies "developments," constituting another use of "development" as a concrete noun.

For its part, the County points out that a few years ago, the Legislature proposed but ultimately rejected "a revision to the HAA that would have broadened the definition of housing development project in exactly the way that [plaintiffs] argue was already in place in the existing law."  A June 13, 2019 Assembly amendment to Senate Bill No. 592 (2019–2020 Reg. Sess.) (Senate Bill No. 592) would have provided that "housing development project" under the HAA "may solely be, or may include, a single unit, including an accessory dwelling unit as defined in Section 65852.2" and "may solely be, or may include, the addition of one or more bedrooms to an existing residential unit."[11]  The accompanying Legislative Counsel's Digest noted that the bill "would define a housing development project for purposes of [the HAA] to also include a single unit, including an accessory dwelling unit, or the addition of one or more bedrooms to an existing residential unit."

The County claims that "[t]his proposed amendment shows that the existing law did not cover single-family homes, because if it did, there would have been no reason to propose such an amendment."  But as the County also admits, our state Supreme Court has "repeatedly observed that the

_____

[11] The trial court took judicial notice of the June 13, 2019 amendment to Senate Bill No. 592.  On our own motion, we take judicial notice of further legislative history of the bill cited below.  (See Evid. Code, §§ 452, subd. (c), 459.)  As ultimately passed, Senate Bill No. 592 addressed matters unrelated to the HAA.  (Stats. 2020, ch. 230.)

20

Legislature's failure to enact a proposed amendment to an existing statutory scheme offers only limited guidance, if any, concerning the Legislature's original intent." (*Martin v. Szeto* (2004) 32 Cal.4th 445, 451.) This is because " '[t]he unpassed bills of later legislative sessions evoke conflicting inferences. Some legislators might propose them to replace an existing prohibition; others to clarify an existing permission. A third group of legislators might oppose them to preserve an existing prohibition, and a fourth because there was no need to clarify an existing permission.' " (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 735, fn. 7.)

Here, the unpassed bill's import is further clouded because the amended definition of "housing development project" was only one of several ways the bill would have changed the HAA. The other changes would have included extending the HAA "to any land use decision by a local agency" and providing that "a general plan, zoning[,] or subdivision standard or criterion is not 'applicable' if its applicability to a housing development project is discretionary or if the project could be approved without the standard or criterion being met." (Assem. Com. on Housing & Community Development, Analysis of Sen. Bill No. 592, as amended June 13, 2019, p. 1.) Moreover, even the amended definition itself had several aspects, providing not just that single units but also ADUs and added bedrooms were covered. Under these circumstances, we cannot parse out the significance of the proposal and rejection of adding "a single unit" to the definition of "housing development project."

Even if we could otherwise interpret the failed amendment to demonstrate the Legislature's collective belief that the HAA either does or does not include a single residential unit, there is a third possibility that subsequent legislative events suggest: There is currently no legislative

21

agreement on this issue, leaving it all the more necessary for us to concentrate on the intent when the law was enacted. Recently, Senate Bill No. 8 (2021–2022 Reg. Sess.) (Senate Bill No. 8) amended the definition of "housing development project" in section 65905.5.[12] That statute, which is also part of the Planning and Zoning Law, limits the number of hearings that may be held on "a proposed housing development project [that] complies with the applicable, objective general plan and zoning standards in effect at the time an application is deemed complete." (§ 65905.5, subd. (a).) Originally, section 65905.5, which was enacted in 2019, provided that " '[h]ousing development project' has the same meaning as defined in paragraph (2) of subdivision (h) of Section 65589.5," that is, as under the HAA. (Former § 65905.5, subd. (b)(3); Stats. 2019, ch. 654, §§ 1, 4.) Senate Bill No. 8 added to section 65905.5's definition so that it now provides not only that the phrase means the same thing it does under the HAA but also that " '[h]ousing development project' includes a proposal to construct a single dwelling unit. *This subparagraph shall not affect the interpretation of the scope of paragraph (2) of subdivision (h) of Section 65589.5*," i.e., the HAA's definition of the phrase. (§ 65905.5, subd. (b)(3), italics added; Stats. 2021, ch. 161, § 2.) The bill also added subdivision (f), which provides that these additions to the statutory definition "do not constitute a change in, but are declaratory of, existing law." (§ 65905.5, subd. (f); Stats. 2021, ch. 161, § 2.)

The italicized portion of the amended definition of "housing development project" demonstrates the Legislature's reluctance to take a

---

[12] At our request, the parties submitted supplemental briefing on what effect, if any, Senate Bill No. 8 had on the interpretation of the phrase "housing development project" under the HAA. We granted plaintiffs' accompanying request for judicial notice of legislative materials related to Senate Bill No. 8.

position on the same phrase's meaning under the HAA, even though it renders section 65905.5 internally inconsistent. "Housing development project" under that provision still "has the same meaning" as it does under the HAA, and Senate Bill No. 8's amendments to the statutory definition "do not constitute a change in, but are declaratory of, existing law." (§ 65905.5, subds. (b)(3)(A), (f).) It would thus follow that the new declaration that the term "includes a proposal to construct a single dwelling unit" (§ 65905.5, subd. (b)(3)(C)) applies equally to the term's definition under the HAA, since the two statutory definitions are equivalent and the amendment to section 65905.5's definition did not change existing law. Yet simultaneously, the new declaration cannot be used to interpret the term under the HAA.

A Senate Committee report on Senate Bill No. 8 frankly acknowledged these contradictions in section 65905.5's amended definition of "housing development project" and tied them to legislative inaction to address the same phrase's definition under the HAA. (Sen. Com. on Governance and Finance, Analysis of Sen. Bill No. 8, Mar. 25, 2021, pp. 3–4.) The report stated,

> "Debate rages in planning circles over whether the HAA applies to single unit projects or just to multi-family projects . . . . Some developers argue that the HAA applies to all housing projects, while, in an unusual alliance, local governments and the [Department] agree that it only applies to developments of two units or more. SB 8 muddies the waters further:

> "On the one hand, SB 8 amends the definition of housing development project in some parts of the bill to include . . . single unit developments, but specifically does not amend the definition in the HAA, even though the bill makes other changes to the HAA.

> "On the other hand, SB 8 says that the changes it makes to the definition of housing development project are declaratory of

23

existing law, which developers might point to in arguing that the HAA's definition should be read broadly.

"What is clear from SB 8 is that housing projects of any size . . . can benefit from the Housing Crisis Act's protections . . . . The scope of the HAA is a much bigger conversation than the issues raised in SB 8, but legislation providing clarity on the definition of housing development project under the HAA may be beneficial down the line."  (*Ibid.*)

Given this clear legislative intent *not* to decide whether "housing development project" under the HAA includes a single residential unit, we will not rely on section 65905.5's amended definition to construe the phrase's meaning.  As plaintiffs point out, even if Senate Bill No. 8 had been intended to clarify the HAA definition, "a legislative declaration of an existing statute's meaning is neither binding nor conclusive in construing the statute. . . . Indeed, there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244.) Instead, considering the statutory definition in context and legislative statements made both when the HAA was originally enacted and when the definition was passed into law, we conclude that it is more reasonable to interpret "housing development project" not to include a project to build an individual single-family home. (See *People v. Cornett* (2012) 53 Cal.4th 1261, 1271 [" '[i]f a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed' "].)

Finally, we address plaintiffs' argument that "[i]n order to effectuate the purpose and intent of the HAA, its definition of 'housing development project' should be interpreted liberally to include individual single-family homes."  As previously noted, the HAA is to be interpreted so as "to afford the

24

fullest possible weight to the interest of, and the approval and provision of, housing." (§ 65589.5, subd. (a)(2)(L).) Such rules of liberal construction do not, however, allow us to ignore the statutory language or construe it " 'to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*Chester v. State of California* (1994) 21 Cal.App.4th 1002, 1008; *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 842; see, e.g., *Leber v. DKD of Davis, Inc.* (2015) 237 Cal.App.4th 402, 410; *Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 526.) The HAA's purpose of encouraging more housing does not compel us to interpret the statute to encompass as many projects as possible, without regard to other indications that a project must have at least two residential units to qualify as a "housing development project" under section 65589.5, subdivision (h)(2)(A).

In any case, we do not agree with plaintiffs that the policy of interpreting the HAA "to afford the fullest possible weight" to providing more housing necessarily means the statute should be construed to apply to individual single-family homes. If a project must include at least two units to benefit from the HAA's easier approval process, potential builders have more incentive to construct more than one unit. Thus, plaintiffs are incorrect that interpreting the HAA to be inapplicable to a project to construct one single-family home will "hav[e] the dire effect of excluding any district zoned solely for single-family homes from the HAA." (Emphasis omitted.) While some might choose not to build a single residence because the project is not covered by the HAA, many others might choose to build multiple single-family homes, and build them more densely.[13]

---

[13] In fact, the Legislature recently enacted a new law that further encourages denser development in areas zoned for single-family homes.

25

Plaintiffs also unduly emphasize that the HAA is intended "to significantly increase the approval and construction of new housing for all economic segments of California's communities." (§ 65589.5, subd. (a)(2)(K).) Housing for more affluent people may not be categorically excluded from the HAA, but many of the Legislature's other statutory findings convey particular concern about the lack of *affordable* housing. For example, the housing crisis is characterized as "hurting millions of Californians, robbing future generations of the chance to call California home, . . . [and] worsening poverty and homelessness." (§ 65589.5, subd. (a)(2)(A).) "Only one-half of California's households are able to afford the cost of housing in their local regions," and "[l]ack of supply and rising costs are compounding inequality and limiting advancement opportunities for many Californians." (§ 65589.5, subd. (a)(2)(E)–(F).) Problems like homelessness, being forced to leave the state, or having limited advancement opportunities are far more likely to affect Californians of lower income levels than parties who are in the position to build their own single-family homes.[14]

Given the statutory context in which the definition of "housing development project" appears and the legislative history, we hold that the

---

Under Senate Bill No. 9 (2021–2022 Reg. Sess.), effective January 1, 2022, "[a] proposed housing development containing no more than two residential units" on a qualifying single-family lot or the proposed subdivision of such a lot is subject to a local agency's ministerial instead of discretionary approval. (§ 65852.21; Stats. 2021, ch. 162, §§ 1–2.)

[14] We do not place such parties in the same category as those who might live in a development of multiple single-family homes like the one at issue in *Honchariw I*. Plaintiffs rhetorically ask why "the Legislature [would] intend for the HAA to apply to multiple single-family homes when permitted together . . . but not when permitted one at a time," but such multi-home projects not only increase housing stock more efficiently but also are more apt to be affordable for a greater number of people.

26

HAA does not apply to projects to build individual single-family homes. Accordingly, plaintiffs' project is not subject to the HAA.

C. *Equitable Estoppel Does Not Apply in This Case.*

Plaintiffs also claim that the doctrine of equitable estoppel precludes the County from arguing that the HAA is inapplicable. Plaintiffs contend that the project was originally clearly subject to the HAA because it included two units, but they removed the ADU because the County "wrongfully" told them they had to do so to get the project approved. We conclude that the claim is forfeited.[15]

Under the doctrine of equitable estoppel, " '[w]henever a party has, by [the party's] own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, [the party] is not, in any litigation arising out of such statement or conduct, permitted to contradict it.' [Citation.] ' "Generally speaking, four elements must be present in order to apply the doctrine . . . : (1) the party to be estopped must be apprised of the facts; (2) [the party] must intend that [its] conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) [the other party] must rely on the conduct to [its] injury." ' " (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37.)

Equitable estoppel " 'ordinarily will not apply against a governmental body except in unusual instances when necessary to avoid grave injustice and when the result will not defeat a strong public policy.' " (*Steinhart v. County*

_____

[15] As a result, we agree with the County that we need not resolve in this appeal whether a project to build a single-family home and an ADU is a "housing development project" under the HAA.

*of Los Angeles* (2010) 47 Cal.4th 1298, 1315.) Thus, even if the doctrine's elements are otherwise met, "the court must weigh the policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest." (*Schafer*, *supra*, 237 Cal.App.4th at p. 1261.) "Particularly in land use cases, '[c]ourts have severely limited the application of estoppel . . . by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern "is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits." [Citation.] Accordingly, estoppel can be invoked in the land use context in only "the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow." ' " (*Id.* at pp. 1262–1263.)

Whether equitable estoppel applies "generally is a factual question for the trier of fact to decide, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law." (*Schafer*, *supra*, 237 Cal.App.4th at p. 1263.) In a case involving the government, "the existence of estoppel is in part a legal question to the extent it involves weighing policy concerns to determine whether the avoidance of injustice in the particular case justifies any adverse impact on public policy or the public interest." (*Ibid.*) We review factual findings for substantial evidence and consider legal questions de novo. (*Id.* at pp. 1263–1264.)

Plaintiffs have forfeited this claim. Although they argued in passing below that the County behaved wrongfully in "forcing [them] to remove the ADU" and should be estopped from claiming that the HAA did not apply, they

made no attempt to demonstrate that the elements of equitable estoppel were met.[16]  Accordingly, the trial court made no findings on this issue.  Moreover, even if we were to conclude that the undisputed facts satisfy the doctrine's standard elements, plaintiffs have not shown that this is the rare land-use case in which equitable estoppel should be applied against the government. (See *Schafer*, *supra*, 237 Cal.App.4th at pp. 1262–1263.)  The claim fails.

D.      *Substantial Evidence Supports the County's Denial of the Project.*

Finally, plaintiffs claim that reversal is required even if the HAA does not apply, because insufficient evidence supports "the County's findings that the [p]roject is inconsistent with [the] policies and code requirements cited as bases for denial."  We are not persuaded.

In analyzing this claim, "[w]e review the entire administrative record" for substantial evidence to support the agency's decision.  (*Schreiber v. City of Los Angeles* (2021) 69 Cal.App.5th 549, 558.)  " ' "We ' "do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the [agency's] decision.  Its findings come before us 'with a strong presumption as to their correctness and regularity.' [Citation.]" ' [Citation.]  When more than one inference can be reasonably deduced from the facts, we cannot substitute our own deductions for that of the agency.  [Citation.]  We may reverse an agency's decision only if, based on the evidence before it, a reasonable person could not have reached such [a] decision." ' " (*Ibid.*)

---

[16] At oral argument, plaintiffs' counsel claimed that plaintiffs raised equitable estoppel in their briefing below and argued it meaningfully before the trial court.  In fact, plaintiffs' discussion of the issue amounted to only a paragraph in their opening brief, a footnote in their reply brief, and a few lines in the reporter's transcript, none of which actually mentioned the doctrine's elements or addressed when the doctrine may be appropriately applied against the government.

Plaintiffs have the burden to demonstrate that insufficient evidence supports the County's determination. (See *ibid.*)

The County made numerous findings to justify its denial of the project. The County concluded that the project was inconsistent with "the mandatory findings for Design Review approval" under Marin County Code section 22.42.060 (section 22.42.060), which in turn requires compliance with the County's Single-family Residential Design Guidelines. Among other things, the County found that the house and parking deck were too large to be compatible with the community and the temporary access road would be too disruptive to the neighborhood and landscape. The County also concluded, for similar reasons, that the project was inconsistent "with the goals and policies of the Marin Countywide Plan" (countywide plan).[17]

Plaintiffs contend there is no substantial evidence to support the County's findings that (1) the project is "out of scale or not compatible with the character of the surrounding neighborhood"; (2) the temporary access road violated section 22.42.060 and the countywide plan; and (3) the project did not comply with the countywide plan's wetland conservation policies. (Capitalization and boldface omitted.) In making these arguments, plaintiffs fail to " 'summarize the evidence on [each] point, *favorable and unfavorable*, and show how and why it is insufficient.' " (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409, some italics omitted.) Rather, plaintiffs concentrate only on the evidence favoring their position and do not present "a fair summary of the evidence bearing on the challenged finding[s]." (*Id.* at pp. 409–410.) Accordingly, they have not met their burden of demonstrating

---

[17] We granted plaintiffs' request for judicial notice of section 22.42.060 and portions of the countywide plan and Single-family Residential Design Guidelines.

30

error, and we have no obligation " 'to undertake an independent examination of the record.' " (*Id.* at p. 409.)

Even if plaintiffs had sufficiently summarized the relevant evidence, we would reject their claim. In arguing that there was insufficient evidence that the project was out of scale with the neighborhood, plaintiffs primarily attack as "misleading" a neighbor's analysis of neighborhood scale, which concluded that the average size of the nearest 25 residences was 1,544 square feet, and urge that their own analysis be credited instead. As the County observes, however, the neighbor rebutted plaintiffs' challenges to his methodology, and we agree the County was entitled to rely on his analysis in determining that the project was out of scale with the neighborhood. Moreover, plaintiffs fail to address other evidence in the record supporting the County's findings, including visual representations of the project and other neighbor testimony. And since plaintiffs do not claim that findings about the project's incompatibility with the neighborhood alone could not justify the County's decision, we need not consider their other two arguments. In short, there was sufficient evidence for the County to deny the project on the basis of the project's outsized character.

## III.
### DISPOSITION

The order denying plaintiffs' petition for a writ of administrative mandamus is affirmed. Respondents are awarded their costs on appeal.

31

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Wiss, J. *

*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Reznitskiy v. Marin County et al.* A161813

32

Trial Court:

Marin County Superior Court

Trial Judge:

Hon. Stephen P. Freccero

Counsel for Plaintiffs and Appellants:

Ryan J. Patterson, Emily L. Brough, Zacks, Freedman & Patterson

Counsel for Amicus Curiae Californians for Homeownership on behalf of Plaintiffs and Appellants:

Matthew Gelfand, Allyson Richman

Counsel for Amicus Curiae California Association of REALTORS® on behalf of Plaintiffs and Appellants:

Neil D. Kalin

Counsel for Amicus Curiae Building Industry Association – Bay Area on behalf of Plaintiffs and Appellants:

Paul B. Campos

Counsel for Amicus Curiae YIMBY Law on behalf of Plaintiffs and Appellants:

Kenneth Stahl, Miller Starr Regalia

Counsel for Defendants and Respondents:

Brian E. Washington, County Counsel

Brian C. Case, Deputy County Counsel

Brandon W. Halter, Deputy County Counsel

*Reznitskiy v. Marin County et al.* A161813